IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CELESTINE DANTZLER, | : | Civil No. 4:24-cv-01492 |
| | : | |
| **Plaintiff,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, | : | |
| Commissioner of Social Security[1] | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.   Introduction

Facts are stubborn things. Facts never change and they never go away. It follows then that fact-finders like Administrative Law Judges (ALJs) have a basic and fundamental duty to confront and honestly address facts, even when those facts may lead the fact-finders to decisions they wish to avoid. They may not ignore uncomfortable facts, and they may not deny those facts.

Yet that appears to have been what has happened once again in this case.

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

We most assuredly do not write upon a blank slate in this case. Quite the contrary, we are now called upon to examine the third Administrative Law Judge (ALJ) decision addressing the plaintiff, Celestine Dantzler's disability claim. Yet a common theme persists throughout this prolonged litigation: each of the decisions assessing the plaintiff's ability to manage and perform in the workplace "fails to dispel the specter of severe mental impairment that looms upon the record in this case." Dantzler v. Berryhill, No. 3:16-CV-02107, 2018 WL 9917678, at *7 (M.D. Pa. July 16, 2018), report and recommendation adopted sub nom. Dantzler v. Saul, No. 3:16-CV-2107, 2019 WL 5569466 (M.D. Pa. Oct. 28, 2019).

Indeed, even a cursory review of the record in this case reveals that the plaintiff suffers from an array of mental impairments, including bipolar, anxiety, post-traumatic stress disorder (PTSD), and depression, that manifest in symptoms of paranoia and hallucinations which affect her ability to interact with others as well as recognize and seek treatment for her mental illness. In fact, at two separate hearings in 2014 and 2018, the plaintiff's testimony was concerning and delusional, stating, among other things, that she hears dogs and other animals talking to her telling her when to use the restroom or clean the toilet. Dantzler's treatment records also repeatedly note hallucinations and paranoid thoughts. Moreover, the gravity of Dantzler's mental impairments was reinforced by the only examining source who opined on her mental status, consultative examiner Dr. Emily Brislin, who concluded

2

Dantzler had marked to extreme limitations in every area of mental functioning, limitations which would render her completely disabled yet which were rejected in three separate opinions. In fact, when remanding this case in 2018, this Court stated that the "fatally terse" rejection of this examining source opinion was "surprising given Ms. Dantzler's disturbed comments at the administrative hearing." Id.

Despite this clear and unequivocal admonition by the Court that the ALJ in this case reconcile the disturbed testimony of Dantzler at the first hearing with the rejection of the only source who examined her, and in the face of similar testimony at a second hearing only reinforcing the need for explanation on this score, in the most recent unfavorable decision the ALJ again rejected this examining source opinion without addressing either the hearing testimony or the treatment notes which note her hallucinations and paranoia. In fact, in rejecting the opinion of Dr. Brislin, the ALJ concluded the plaintiff's records "reveal no issues with delusions," despite the same records he cited repeatedly noting delusional thoughts and the ALJ himself witnessing delusional statements from the plaintiff at the administrative hearing.[2]

---

[2] The ALJ's assertion that Dantzler's records "reveal no issues with delusions" even though Dantzler voiced floridly delusional thoughts in the presence of two ALJs exposes the inherently flawed nature of this analysis. To accept the accuracy of this extraordinary factual finding in the face of Dantzler's delusional testimony regarding her conversations with her dogs we would have to conclude that the ALJ—like Dantzler—actually believed that her pets were talking to her.

In our view, the latest ALJ decision in this case still fails to adequately capture, address, and reconcile the plaintiff's mental impairments with her ability to perform work-related activity and rejects the opinion of the only source who examined the plaintiff based upon a clear misstatement of fact. Simply put, more is needed here before the opinion of the consultative examiner is discounted. Accordingly, we will remand this case for further consideration by the Commissioner.

## II.    Statement of Facts and of the Case

### A. Introduction

This legal odyssey began thirteen years ago, in May 2013, when Celestine Dantzler protectively filed under Titles II and XVI of the Social Security Act for a period of disability and disability insurance benefits as well as supplemental security insurance, alleging an onset of disability beginning December 1, 2012. (Tr. 17).

Over the years Dantzler has cited a constellation of severe physical and emotional impairments in support of this disability application. Thus, at various times ALJs have concluded that Dantzler suffers from an array of impairments including diabetes, obesity, back and hip pain, hypertension, degenerative disc disease of the lumbar spine, bipolar disorder, anxiety disorder, post-traumatic stress disorder, alcohol use disorder, and marijuana use disorder.[3] (Tr. 20, 974, 3269).

---

[3] Incredibly, despite the plaintiff's disturbed testimony at her first hearing, the first ALJ to issue a decision in this case did not find any mental impairment severe at

4

Dantzler was born on November 12, 1962. (Tr. 3280). Thus, she was 50 years old when this litigation began, which initially defined her as an individual closely approaching advanced age under the Social Security regulations. However, over the thirteen years that this application has been pending she transitioned into an individual of advanced age. (Tr. 981). Dantzler had past relevant work experience as a nurse's aide/assistant, work which all agree she can longer perform. (Tr. 980, 3279).

## B. **The Medical Record of Dantzler's Mental Impairments**

Despite the lengthy history of this case, which began some thirteen years ago in 2013, each of the three ALJ decisions in this case has addressed essentially the same medical records. Nonetheless, in each of these decisions the summary of the longitudinal treatment records falls far short of capturing the degree of mental impairment suffered by the plaintiff. In fact, the most recent ALJ decision blatantly misstates facts which are obvious and readily available from a cursory review of the record.

On this score, the relevant period of review in this case begins on the alleged onset date in December 2012 and ends on the date Dantzler switched age categories

---

Step 2 and, in fact, did not even mention Dantzler's bipolar disorder in the Step 2 analysis. (Tr. 20). At the second hearing, the next ALJ stated, "I don't see how there could be a finding of no severe mental impairments, frankly." (Tr. 998).

and was considered disabled, November 10, 2017.[4] Dantzler's psychiatric treatment notes throughout this time indicate she suffered from auditory and visual hallucinations, delusions, and paranoia and that her insight and judgment were regularly described as poor. For example, starting with her psychiatric treatment at Community Counseling Services in February 2014, intake notes state she hears voices coming from the TV sounding as though they are pleading with her. (Tr. 872). In September 2015, despite reporting daily compliance with medications, she reported anxiety, mood swings, racing thoughts, paranoia, thinking people in her apartment plan to kill her and being worried about drones, increase in irritability, crying spells, and auditory and visual hallucinations saying a soft voice and faded form talk to her. (Tr. 1543). Nonetheless, she was described as fully oriented in the mental status examination. (Id.) Throughout 2016 treatment notes were repeatedly positive for paranoia, and auditory and visual hallucinations. In February 2016 she stated she felt animals talk to her, (tr. 1539), in May she again reported auditory and visual hallucinations and paranoia, (tr. 1535), and in July 2016 she reported acting out in public and having no patience for normal situations, stated she sees a black circle that might be evil, and was paranoid that women are trying to shoot her. (Tr. 1533). Yet again, these same mental status examinations describe her as fully

---

[4] As explained below, before this decision was last remanded the ALJ had issued a partially favorable decision, finding that once the plaintiff transitioned age categories to an individual of advanced age she became disabled.

oriented. (Id.) In September 2016 she again reported hearing faint voices pleading saying either she or someone else will die. (Tr. 1531). She also reported paranoia and stated she sometimes feels people are following her. (Id.) Thus, Dantzler's symptoms of auditory and visual hallucinations and delusions were regularly and thoroughly documented by her treating providers throughout the relevant period

Indeed, these same progress notes frequently state that Dantzler suffered from delusions and had poor insight and judgment. (Tr. 961, 1533, 1543, 1562, 1565, 1567, 1558, 1654). She also regularly reported interpersonal conflicts with her neighbors and angry outbursts.[5] (Id.) And one treating provider noted, she "appears unable to appropriately read social cues" after she discontinued an outpatient treatment program. (Tr. 1574).

In addition to the treatment notes during the relevant period, the record also contains the psychiatric evaluation of consultative examiner Dr. Emily Brislin conducted early in the relevant period, on August 2, 2013. Dr. Brislin noted a history of psychiatric hospitalization in 2008 for drug addiction and depression and the plaintiff explained, "I didn't feel like I had the will to live anymore." (Tr. 622). She reported a prior history of crack cocaine abuse, but noted she had been clean since 2009, and reported drinking one bottle of wine per day. (Tr. 622). She reported

---

[5] In fact, though not during the relevant period, Dantzler was psychiatrically hospitalized in 1988 for attempted homicide after stabbing her husband. (Tr. 872).

multiple terminations with her longest job being two years. (Tr. 622). Dantzler reported a history of depression with symptoms of mania and reported multiple traumatic events in her past including fights, sexual abuse, and domestic violence. (Tr. 623). Her mental status examination was largely within normal limits, but Dr. Brislin noted logical but tangential thoughts, low average intelligence, and short-term memory problems. Dr. Brislin also explained that the plaintiff had serious difficulties with impulse control, interacting with others, and in understanding her own mental limitations, stating:

> Coping strategies reflect deficient supports. She reported that she has limited social support and is not currently in treatment for her psychiatric difficulties. Impulse control is poor, exemplified by her substance abuse and history of violent behaviors. She further demonstrated poor judgment evidenced by the time she stabbed her husband with scissors in front of a police officer. . . . She was able to identify the purpose of today's evaluation, but reported she does not need treatment reflecting limited awareness and need for treatment.

(Tr. 624). Although Dr. Brislin reported that the plaintiff lived alone and was able to manage her personal funds and perform some activities of daily living, she also noted that Dantzler spent money frivolously and lived in an efficiency apartment which was often cluttered. (Tr. 624). Dantzler reported not getting along well with others and described difficulty maintaining relationships, including a history of altercations, multiple arrests, and the incident in which she stabbed her husband with scissors. (Tr. 625). Dr. Brislin stated the plaintiff was easily distracted and may have difficulty completing a task from beginning to end or sustaining a routine and that

her impulsive decision making would make it difficult to perform at a consistent pace. (Tr. 625).

### C. The Medical Opinion Evidence

After examining the plaintiff, on August 2, 2013, Dr. Brislin opined that Dantzler had marked limitations in her ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions and extreme limitations in understanding, remembering, and carrying out complex instructions and making judgments on complex work-related decisions. (Tr. 627). Dr. Brislin further opined that the plaintiff had marked limitations in her ability to interact appropriately with the public, supervisors, and coworkers, and extreme limitations in her ability to respond appropriately to usual work situations and changes in a routine work setting. (Tr. 628).

Apart from Dr. Brislin, two non-examining, non-treating psychiatric consultants opined on Dantzler's RFC. On September 5, 2013, Dr. John Grutkowski opined that Dantzler had no understanding and memory limitations and no sustained concentration and persistence limitations, but, noted "some social discomfort" and opined she would have moderate limitations in interacting appropriately with the general public, but no limitations in accepting instructions from supervisors or getting along with coworkers or peers and no limitations in maintaining socially

appropriate behavior. (Tr. 82). Nonetheless, under the MRFC "additional explanation," Dr. Grutkowski stated "unable to perform simple repetitive tasks." (Tr. 82).

Three years later, on November 10, 2016, another non-examining, non-treating source, Dr. Marci Cloutier, opined on Dantzler's mental abilities. In the RFC additional explanation, Dr. Cloutier characterized September 2016 mental status examination notes as "essentially unremarkable," yet our review of these same notes shows at a September 2016 appointment the plaintiff reported hearing faint voices saying either she or someone else will die, paranoia of people following her, racing thoughts, and mood swings. (Tr. 1531). Based on her review of these records, Dr. Cloutier opined that Dantzler could understand and remember very short and simple instructions but would be moderately limited in understanding and remembering detailed instructions, moderately limited in her ability to complete a normal workday without interruption but not significantly limited in sustaining an ordinary routine or working in coordination with others. (Tr. 1110). Dr. Cloutier further opined that the plaintiff was moderately limited in accepting instructions and responding appropriately to supervisors and interacting with the general public but was not significantly limited in getting along with coworkers or peers, stating, "social skills adequate." (Tr. 1110). She also opined that Dantzler was moderately limited in responding appropriately to changes in the work setting but that she was "able to

adapt without special supervision." (Tr. 1111). Dr. Cloutier concluded that, "if [the plaintiff] abstains from abusing illicit substances, [the plaintiff] appears reasonably capable of making simple decisions, interacting effectively with others, coping with minor stressors and performing simple routine type tasks." (Tr. 1111).

**D.** **The Plaintiff's Hearing Testimony and Prior ALJ Decisions**

In the context of these treatment notes demonstrating Dantzler was clearly struggling with, at times, severe symptoms of her mental impairments, she was also navigating a prolonged disability process. Throughout this process, Dantzler had the opportunity to testify before two different ALJs at three hearings. At two of these hearings, Dantzler's testimony demonstrated the degree of symptomology reflected in the treatment records. Indeed, the issue of her delusions and hallucinations was squarely before the ALJs in this case.

At the outset, following her initial disability application in May of 2013, Dantzler's claim was heard by an ALJ on November 14, 2014. (Tr. 34-72). At this 2014 disability hearing, Dantzler presented erratic and often delusional testimony. For example, when asked about her racing thoughts, she stated:

> If I don't make a bowel movement, I hear dogs barking and they will be calling me to go the bathroom. And then, as soon as I go, then they stop barking and stuff, and then – and it just worries me so much, because sometimes I can't figure out what it is. It may be they are telling me to clean the toilet. I clean a toilet or on a day, I didn't have a bath – I might need to take a bath and stuff.

(Tr. 49-50). She also described violent confrontations with her neighbor, stated that she had no friends or family and that she, "read[s] the Bible and stuff and tr[ies] not to jump off the 10th floor," (tr. 47), did not recall going to the emergency department in January of 2014, (tr. 52), and, at the end of the hearing engaged in what this Court has described as " a scatological flight-of-ideas" in which she discussed being orally raped, having her hemorrhoids removed, and that animals can smell it when she defecates. (Tr. 71; Dantzler, 2018 WL 9917678, at *7). Moreover, she seemed completely unable to articulate or recognize the symptoms of her mental illness. (Tr. 44-47).

In the face of this disturbing hearing testimony, on March 16, 2015, the ALJ issued a decision denying Dantzler's claim. (Tr. 11-26). In this decision, although the residual functional capacity (RFC) did include accommodations for mental limitations, the ALJ included no analysis of any mental impairments at Step 2, presumably finding them not severe, and discounted the opinion of the consultative psychological examiner who concluded Dantzler had marked to extreme limitations in multiple areas of mental functioning. In doing so, the ALJ failed to address or reconcile the disturbed hearing testimony with his rejection of the examining source opinion, instead focusing on normal mental status examinations in the record. (Tr. 20). Dantzler appealed this adverse agency decision and, on October 28th, 2019, this Court remanded Dantzler's case to the Commissioner, finding that the ALJ did not

adequately explain his rejection of the consultative psychological examiner's medical opinion and medical source statement. Dantzler, 2018 WL 9917678. In recommending this case be remanded, the Court stated the lack of discussion of the evidence supporting the marked and extreme limitations opined by the consultative examiner was surprising given the plaintiff's disturbed comments at the administrative hearing and concluded the ALJ cherry-picked evidence in rejecting the opinion of the consultative examiner and did not properly confront the "grave implications" of her severe mental illness. Id.

With this strict admonition by the Court to adequately reconcile the analysis of the opinion evidence with Dantzler's disturbed hearing testimony, a second round of administrative proceedings ensued with a different ALJ at a hearing on March 10, 2020. (Tr. 991-1038). At this second hearing, Dantzler again engaged in disturbing, delusional testimony, describing her phobias of animals and that they, "try to tell me things," can smell if she does not make a bowel movement, and tell her when people are dying. (Tr. 1018).

Following this hearing, the ALJ entered a partially favorable decision on April 22, 2020, finding the plaintiff was disabled after November 11, 2017, when her age category changed to an individual of advanced age. (Tr. 966-990). Notwithstanding the Court's admonition that the examining source opinion of Dr. Brislin be carefully assessed in the context of the plaintiff's hearing testimony, the ALJ once again

rejected this examining source opinion and made no mention of Dantzler's testimony at either hearing which laid her mental impairments on full display. (Id.). Instead, this ALJ again focused on the same evidence the Court had previously found to be cherry-picked including conservative treatment, some normal mental status examination findings, and the fact that treatment notes showed she was "doing well with no delusions, okay memory, and okay mood." (Tr. 979).

Dantzler appealed this decision, and, on May 26, 2022, this Court remanded the ALJ's decision once again. On appeal, the plaintiff again challenged the rejection of Dr. Brislin's opinion, but the Court did not reach this issue, instead remanding on the narrow issue of the ALJ's failure to address the third-party function report of the plaintiff's sister, which seemed to support the findings of the consultative examiner. (Tr. 3341-61). Thus, the Court remanded the unfavorable portion of the ALJ's decision and ordered the ALJ to conduct new proceedings to address the unfavorable period between the alleged onset date of December 1, 2012, through November 10, 2017, when she transitioned age categories and became disabled.

### D. The Third ALJ Hearing and Decision

On April 4, 2024, Dantzler received her third administrative hearing on her disability claim. (Tr. 3290-3314). The plaintiff's testimony at this hearing was limited since the parties agreed her testimony from the prior two hearings, which were before the ALJ, would be sufficient for the purposes of issuing a third decision.

14

(Tr. 3296). A vocational expert also testified that being frequently unable to interact appropriately with coworkers or supervisors would preclude employment in those occupations identified.[6] (Tr. 3309-10).

Following this hearing, on May 17, 2024, the ALJ issued a third decision addressing the unfavorable portion of Dantzler's claim between December 1, 2012, and November 10, 2017. (Tr. 3263-3289). In this decision, at Step 1 the ALJ found that the plaintiff met the insured status requirements of the Social Security Act through September 30, 2013, and had not engaged in substantial gainful activity since December 1, 2012, the alleged onset date. (Tr. 3269). At Step 2 the ALJ found that during the relevant period, Dantzler had the following severe impairments: degenerative disc disease of the lumbar spine, diabetes, obesity, bipolar disorder, anxiety disorder, post-traumatic stress disorder, alcohol use disorder, and marijuana use disorder. (Id.)

When addressing Dantzler's mental impairments at Step 2, the ALJ concluded she had a mild limitation in understanding, remembering or applying information, and moderate limitations in interacting with others, concentrating, persisting, or

---

[6] Since we remand for other reasons, we do not reach the plaintiff's issue regarding whether the plaintiff is capable of performing SVP2 occupations despite being limited to understanding, remembering, and carrying out simple instructions. We do note, however, that the hearing testimony by the vocational expert on this score was confusing and seemed to imply that some SVP2 occupations required following detailed instructions. (Tr. 3311-12).

maintaining pace, and managing oneself. (Tr. 3271). The Step 2 analysis focused on Dantzler's reported activities of daily living during the relevant period as well as mental status examinations showing "while the claimant has had a depressed mood and constricted affect with intermittently poor insight and judgment, she has had period of a normal mood and affect as well as normal thought content and processes, an alert and oriented sensorium, and no noted memory, attention, concentration, or cognitive deficits." (Tr. 3272). This analysis did not mention her hearing testimony demonstrating she was actively experiencing hallucinations and delusions or her history of interpersonal conflicts and paranoia.

After concluding at Step 3 that none of Dantzler's impairments met a listing requirement, (Tr. 3269), the ALJ fashioned the following residual functional capacity (RFC) assessment for the plaintiff:

> After careful consideration of the entire record, the undersigned finds that from December 1, 2012, through November 10, 2017, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant could occasionally push and/or pull with lower extremities, such as operating pedals or foot controls. She could occasionally stoop, kneel, crouch, use ramps, and climb stairs, but could never balance, crawl, or climb ladders, ropes, or scaffolding. She could occasionally reach overhead. She could frequently perform gross handling and fine manipulation, including gripping, grasping, handling, fingering, feeling and keyboarding. She could tolerate occasional exposure to vibrations. She should avoid wet or slippery conditions and other workplace hazards, such as unprotected heights and dangerous moving machinery. She could perform jobs that would take no more than 30 days of training to learn with a specific vocational preparation level of two (SVP 2), which are generally classified as unskilled. She could understand, remember,

and carry out simple instructions. She could perform simple, routine, and repetitive tasks. She could perform jobs that would be considered "low stress" in that they would involve only occasional, simple decision making, and only occasional, gradual changes in the work duties and work setting. She could have occasional interaction with coworkers and supervisors and could have rare/incidental contact with customers or members of the general public.

(Tr. 3274).

While this RFC contained some mental restrictions, the RFC analysis was, again, "fatally terse," with regard to the review of Dantzler's psychological symptoms, as noted in the record, and, in fact, contained glaring misstatements of fact. The ALJ summarized the record of the plaintiff's mental impairments in a single paragraph, noting:

Regarding the claimant's noted mental impairments, the record reveals treatment at Community Counseling Services for Bipolar Disorder, Anxiety, PTSD, and a history of Polysubstance Abuse, in remission. (Exhibits D17F; D21F; D24F; D25F). Upon intake in February of 2014, the claimant indicated she felt she could not get a job because of a criminal background check. She exhibited social isolation and depression and indicated that she heard voices. A past history of drug and alcohol abuse was noted, but the claimant stated her last drug use occurred in 2009. Mental status examinations of record performed by various providers of record throughout the relevant time period reveal that while the claimant has had a depressed mood and constricted affect with intermittently poor insight and judgment, she has had periods of a normal mood and affect as well as normal thought content and processes, an alert and oriented sensorium, and no noted memory, attention, concentration, or cognitive deficits. (Exhibits D3F; D4F; D6F; D7F; D9F; D10F; D11F; D13F; D14F; D16F; D17F; D18F; D19F; D20F; D21F; D22F; D23F; D24F; D25F). There is no evidence that the claimant presented during the relevant time period for inpatient psychiatric hospitalization or treatment in a partial outpatient program.

17

(Tr. 3276). This summary notably excluded any discussion of the plaintiff's testimony at the two prior hearings, which clearly demonstrated a degree of impairment much more severe than characterized by the ALJ in this assessment. It also mischaracterized the treatment notes, focusing on normal portions of mental status examinations but excluding repeated notes in the record that the plaintiff experienced auditory and visual hallucinations, delusions, and paranoia.

Against this mischaracterized record of her mental impairments, the ALJ once again rejected the opinion of the only medical professional who examined the plaintiff during the relevant period that she had marked to extreme limitations in many areas of mental functioning which, according to each vocational expert who testified, would render her disabled. (Tr. 2102-2103). In doing so, the ALJ's conclusion that Dr. Brislin's opinion was not consistent with the claimant's treatment records was based upon a misstatement of fact, that "the claimant's treatment records reveal no issues with delusions, memory, attention, concentration, or cognition." (Tr. 3277). But this statement by the ALJ is belied by both the plaintiff's testimony at both hearings that she was actively experiencing delusions as well as the treatment records which reveal a history of delusions, auditory and visual hallucinations, and paranoia.

The ALJ also gave little weight to the opinion of State agency expert Dr. Grutkowski who concluded Dantzler was unable to perform simple repetitive tasks,

18

citing generally to the "largely normal" mental status examination findings. (Tr. 3278). Instead, the ALJ gave partial weight to the assessment of Dr. Cloutier, which described September 2016 treatment notes in which Dantzler reported to her treating provider hearing faint voices saying she or someone else will die, paranoia, racing thoughts, and mood swings, as "essentially unremarkable." (Tr. 1531). The ALJ largely adopted the "paragraph B" limitations of Dr. Cloutier, citing to these same mental health treatment records that the ALJ also concluded showed conservative and routine treatment and "largely normal" mental status examination findings. (Id.) The ALJ also addressed the third-party function reports of Dantzler's friend, William Harrison, and her sister, Sandra Crosson, but gave them only partial weight. (Tr. 3279).

Having reached these conclusions, the ALJ held that Dantzler could not perform her past relevant work from December 1, 2012, through November 10, 2017, but that there were jobs that existed in significant numbers in the national economy that she could perform during that period. (Tr. 3279-80). Therefore, the ALJ denied her claim for benefits from 2012 through 2017. (Tr. 3279-81).

This appeal followed. (Doc. 1). On appeal, the plaintiff presents familiar arguments, again alleging, *inter alia*, that the ALJ's decision was not supported by substantial evidence because the ALJ erred in evaluating the medical opinion of the consultative examiner and in formulating Dantzler's RFC. Upon consideration, we

19

agree that this decision—like the two prior decisions made in Dantzler's case—is fundamentally flawed. Therefore, we will order this case remanded for further consideration by the Commissioner.

## III.   Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [he] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See</u> <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205,

21

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable

> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or he contributed to

23

the insurance program, is under retirement age, and became disabled prior to the date on which he or he was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence

25

standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C. Analysis of Medical Opinions—The Treating Source Rule

The Commissioner's regulations which applied in 2013 when Dantzler began this case also set standards for the evaluation of medical evidence, and defined medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence under this treating physician rule, the ALJ is guided by factors outlined in 20 C.F.R.

26

§404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. See 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is

27

consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c).

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by a number of different medical sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when weighing competing medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14-CV-00158-GBC, 2015 WL 1295956, *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96-2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10-CV-197-PB, 2011 WL 2359055, *9 (D.N.H. Jun. 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different

medical opinions. See, e.g., Thackara v. Colvin, No. 1:14-CV-00158-GBC, 2015 WL 1295956, *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

It is against these benchmarks that we assess the ALJ's decision case.

**D. This Case Will Be Remanded.**

In our view, this third ALJ decision, like the two decisions which preceded it, is flawed in ways which compel remand. The plaintiff's primary argument, which she has previously successfully argued before this Court, is that the ALJ's assessment of consultative examiner Dr. Brislin's opinion which, if adopted, would have rendered the plaintiff completely disabled, was deficient. Moreover, as a consequence of rejecting the opinion of Dr. Brislin, without substantial evidence to support that rejection, the plaintiff argues the ALJ did not incorporate all of the plaintiff's limitations in the RFC assessment. We agree.

At the outset, the ALJ's rejection of this examining source opinion was based upon an incomplete assessment of the longitudinal medical which seemed to cherry-pick the treatment records, focusing on normal portions of mental status examinations but ignoring glaring evidence of ongoing significant symptoms of her impairments in the same notes the ALJ cited. On this score:

> Although the Third Circuit "do[es] not expect the ALJ to make reference to every relevant treatment note in a case [involving] voluminous medical records, [the court] do[es] expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record

29

consistent with his responsibilities under the regulations and case law." Fargnoli v. Massanari, 247 F.3d 24, 42 (3d Cir. 2001); see also Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."). Moreover, an ALJ is not permitted to "cherry-pick[ ]" or ignor[e] medical assessments that run counter to her finding." Rios v. Comm'r of Soc. Sec., 444 F. App'x 532, 535 (3d Cir. 2011) (citing Dougherty v. Barnhart, Civ. No. 05-5383, 2006 WL 2433792, at *10 n.4 (E.D. Pa. Aug. 21, 2006); Colon v. Barnhart, 424 F. Supp.2d 805, 813-14 (E.D. Pa. 2006) ); see also Schroeder v. Berryhill, Civ. No. 16-464, 2017 WL 4250057, at *17 (M.D. Pa. Sept. 5, 2017) ("The sort of evaluation, where the evaluator mentions only isolated facts that militate against the finding of disability and ignores much other evidence that points another way, amounts to a 'cherry-picking' of the record which this Court will not abide."). Similarly, "[w]hen a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993) ). "The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Id. (quoting Stewart v. Sec. of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983) ).

Smith v. Berryhill, No. CV 17-2661, 2018 WL 7048069, at *9 (E.D. Pa. Nov. 27, 2018), report and recommendation adopted, No. CV 17-2661, 2019 WL 199942 (E.D. Pa. Jan. 11, 2019).

In this case, because the ALJ failed to mention and discuss relevant evidence, "the court does not know whether the ALJ overlooked/ignored this evidence or rejected it, and if he rejected it, on what basis." Id. (citing Burnett, 220 F.3d at 121 ("In the absence of [an indication of which evidence the ALJ rejects and his underlying reasoning] the reviewing court cannot tell if significant probative

evidence was not credited or simply ignored")). This is particularly perplexing since this Court provided the ALJ in this case a roadmap to adequately assess the opinion of Dr. Brislin in 2018, yet the ALJ's most recent decision suffers from several of the same fatal flaws as the first decision.

First, despite this Court's clear admonition that the ALJ's failure to consider both adverse treatment notes as well as Dantzler's "disturbed" comments at the administrative hearing in weighing the opinion of Dr. Brislin was error, and in the fact of the plaintiff's second disturbed and delusional hearing testimony, no ALJ has addressed or reconciled the plaintiff's testimony, which seems to reinforce the marked and extreme limitations opined by the examining source, with the rejection of Dr. Brislin's opinion.

Moreover, the ALJ's most recent analysis is still "fatally terse" in that it focuses on "largely normal" mental status examination findings, citing to the entirety of the plaintiff's mental health records, yet ignores clear evidence of the plaintiff's severe psychiatric symptoms in those same records. Indeed, Dantzler's psychiatric treatment notes throughout the relevant period indicate she regularly suffered from auditory and visual hallucinations and delusions and that her insight and judgment were consistently described as poor. For example, February 2014 intake notes state she hears voices coming from the TV sounding as though they are pleading with her, (tr. 872); in September 2015, despite mental status notes stating she was fully

31

oriented, the same notes reported paranoid thoughts that people in her apartment plan to kill her and being worried about drones and auditory and visual hallucinations saying a soft voice and faded form talk to her, (tr. 1543); in February 2016 she stated she felt animals talk to her, (tr. 1539); in May 2016 she again reported auditory and visual hallucinations and paranoia, (tr. 1535); and in July 2016 she reported acting out in public and having no patience for normal situations, stated she sees a black circle that might be evil, and was paranoid that women are trying to shoot her. (Tr. 1533). Nonetheless, through many of these examinations she was still described as fully oriented at the examination. (Id.) In September 2016 she again reported hearing faint voices pleading saying either she or someone else will die. (Tr. 1531). She also reported paranoia and stated she sometimes feels people are following her. (Id.)

Most fundamentally, the ALJ's rejection of the opinion of Dr. Brislin is simply based upon a blatant misstatement of fact. Thus, while the ALJ stated the opinion of Dr. Brislin was not consistent with the medical record since, "the claimant's treatment records reveal no issues with delusions, memory, attention, concentration, or cognition," the progress notes referenced by the ALJ in fact, are replete with notes stating that Dantzler suffered from delusions and had poor insight and judgment. (Tr. 961, 1533, 1543, 1562, 1565, 1567, 1558, 1654). She also regularly reported interpersonal conflicts with her neighbors and angry outbursts, attempted to murder

her husband, and was described as "unable to appropriately read social cues." (Tr. 1574).

At base, the issue of Dantzler's mental illness was plainly before the ALJ, yet the ALJ utterly ignored the evidence of these severe symptoms. Thus, while the ALJ may have a reason for discounting Dantzler's disturbed testimony and the evidence of her severe mental illness throughout the record, since the ALJ has simply ignored this evidence in the evaluation of the medical opinion evidence, "the court does not know whether the ALJ overlooked/ignored this evidence or rejected it, and if he rejected it, on what basis." Smith v. Berryhill, No. CV 17-2661, 2018 WL 7048069, at *9 (E.D. Pa. Nov. 27, 2018), report and recommendation adopted, No. CV 17-2661, 2019 WL 199942 (E.D. Pa. Jan. 11, 2019).

These errors in the assessment of the evidence clearly affected the ALJ's conclusions as to the supportability and consistency of the opinion of Dr. Brislin, since the omitted treatment records seem to entirely support the consultative examiner's conclusions regarding the marked and extreme mental limitations of the plaintiff, particularly with regard to her poor insight into her own mental conditions and her ability to interact with, and work cooperatively with others. Instead, the ALJ adopted the limitations of a non-treating, non-examining source who also mischaracterized the record over the only source who examined the plaintiff. This was error. And the rejection of Dr. Brislin's opinions in these arenas was outcome

33

determinative, since vocational experts testified at three different hearings that the limitations opined by Dr. Brislin would be disabling. (Tr. 67-69, 1033-34, 3309-10).

Simply put, the ALJ's attempt to characterize Dantzler's mental health symptomology as benign and unremarkable fails when viewed against the full record of evidence that was disregarded without explanation by the ALJ. This cascade of errors committed by the ALJ resulted in the rejection of an examining source opinion for reasons that were not supported by substantial evidence. Thus, while nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be, this case should be remanded so the ALJ may make an assessment on Dantzler's case considering all the evidence in the record.

### III.    <u>Conclusion</u>

Accordingly, given that we find the ALJ's determination is not supported by substantial evidence, the final decision of the Commissioner will be VACATED, and this case will be REMANDED for further consideration by the Commissioner.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: May 22, 2026

34